1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

10

11  ISAIAH RASHAD TAYLOR,

12  　　　　　　　　　　　　Petitioner,

13

14  　　　vs.

15

16

17  DR. JEFFREY BEARD, Secretary,

18  　　　　　　　　　　　　Respondent.[1]

19

Civil No. 11cv1165-BTM (BLM)

**ORDER:**

**(1)  ADOPTING IN PART, DECLINING TO ADOPT IN PART, AND ADOPTING IN PART AS MODIFIED, THE FINDINGS AND CONCLUSIONS OF UNITED STATES MAGISTRATE JUDGE;**

**(2)  DENYING PETITION FOR A WRIT OF HABEAS CORPUS; and**

**(3)  ISSUING A CERTIFICATE OF APPEALABILITY**

20　　　　Isaiah Rashad Taylor (hereinafter "Petitioner"), is a California prisoner proceeding pro

21  se and in forma pauperis with a Petition for a Writ of Habeas Corpus filed pursuant to 28 U.S.C.

22  § 2254.  (ECF No. 1.)  Petitioner is serving a sentence of life in prison with the possibility of

23  parole, plus ten years, as a result of a conviction by a San Diego County Superior Court jury of

24  kidnapping for robbery and kidnapping during a carjacking; the jury also found he personally

25  used a firearm and committed the offenses in connection with a criminal street gang.  He alleges

26

27　　　　　[1]  The Clerk of Court is directed to amend the docket to reflect that Dr. Jeffrey Beard, the Secretary of the California Department of Corrections and Rehabilitation, has been substituted as Respondent in place of his predecessor and former Respondent Martin Hoshino.  See Fed. R. Civ. P. 25(d) (requiring automatic substitution as a party the successor of a public office).

28

-1-

11cv1165

here, as he did in state court, that his federal Constitutional rights were violated due to an impermissibly suggestive identification (Claim 1), ineffective assistance of trial counsel (Claims 2, 4-5), insufficient evidence to support the gang enhancement (Claim 3), and the cumulative effect of the errors (Claim 6).  (Pet. at 6-9; Memo. P&A Supp. Pet. ["Pet. Mem."] at 19-41.)

United States Magistrate Judge Barbara L. Major has filed a Report and Recommendation ("R&R") which recommends the Petition be denied because the state court's adjudication of Claims 1-5 is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and because Petitioner has failed to show any errors to accumulate.  (ECF No. 29.) Petitioner has filed Objections ("Obj.") to the R&R.  (ECF No. 34.)

The Court has reviewed the R&R and the Objections thereto pursuant to 28 U.S.C. § 636(b)(1), which provides that: "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).

**1.    Claim 1**

Petitioner alleges in Claim 1 that the victim's identification of Petitioner as the man who kidnapped, carjacked, and robbed him was made under circumstances which were unduly suggestive, and its use at trial, over a defense objection, violated his rights to due process and a fair trial under the Sixth and Fourteenth Amendments.  (Pet. at 6; Pet. Mem. at 12-24.) Respondent answers that the denial of this claim by the state court is objectively reasonable, and any error is harmless.  (Memo. P&A in Supp. Answer ["Ans. Mem."] at 8-16.)

This claim was presented to the state supreme court in a petition for review, which was summarily denied, and to the appellate court on direct appeal, which denied it on the merits. (Lodgment No. 3 at 12-24; Lodgment No. 7 at 12-16; Lodgment No. 6, <u>People v. Taylor</u>, No. D055375, slip op. at 6-14 (Cal.App.Ct. Dec. 16, 2010).)  Because the claim was adjudicated on the merits in the state court, as were all the claims presented here, the Court must examine the last reasoned opinion of the state court, in this case the appellate court opinion, in order to determine whether the state court's "adjudication of the claim - (1) resulted in a decision that

was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006).

The state appellate court summarized the identification procedures:

> In his initial interview with police after the incident, Kukukafi [the victim] described Taylor [Petitioner] as a 19- or 20- year-old Black man, 5 feet 11 inches tall, weighing approximately 200 pounds. Kukukafi said Taylor's hair was in cornrows and he was wearing a dark sweatshirt with a white stripe across the top. Detectives asked Kukukafi to view three photographic lineups. The first lineup consisted of a photograph of a suspect and two filler photographs, none of which were of Taylor. Kukukafi stated a man in one of the filler photographs looked like Taylor but he was not certain it was him. The second lineup consisted of six Polaroid photographs, including a poor quality photograph of Taylor. Kukukafi did not identify Taylor. The third lineup also consisted of six photographs, one of which was Taylor's driver's license photo. Kukukafi did not identify Taylor, saying, "I can't tell. (The perpetrator) doesn't look like anyone in the photos."

> At the preliminary hearing on May 16, 2007, Taylor was seated at the defense table next to [Petitioner's co-defendant] Stillwell, [footnote: Stillwell later pleaded guilty pursuant to a plea agreement] whom Kukukafi had identified on February 1 as the person that had been with him when he notified police officers of the kidnapping. Taylor and Stillwell were both wearing prison clothing. Kukukafi identified Taylor as the man who had asked him for directions and then kidnapped him at gunpoint. [¶] The defense moved to exclude evidence of Taylor's identification at the preliminary hearing and to preclude Kukukafi from making an in-court identification at trial. The trial court stated it did not believe the circumstances at the preliminary hearing were unnecessarily suggestive and denied the motions to exclude Taylor's identification.

(Lodgment No. 6, <u>Taylor</u>, No. D055375, slip op. at 6-7.)

The state appellate court found that "[t]he circumstances of Taylor's in-court appearance at the preliminary hearing clearly suggested the identity of the perpetrator of the kidnapping and robbery in advance of his identification by [the victim], and the identification procedure was therefore unfair and unduly suggestive." (<u>Id.</u> at 9.) The state court went on to find, applying clearly established federal law, that the identification was nevertheless reliable because the record showed that the victim: (1) had an extended opportunity to observe Petitioner, having spent more than two hours in close proximity, including several face-to-face encounters; (2) was able to describe the events of the kidnapping in detail, indicating that his attention level was good and unimpaired; (3) was the same race as Petitioner and provided police with a description

which matched Petitioner's physical description; and (4) was certain of the identification, which was made within a reasonable time, three and a half months after the offense. (Id. at 11-12.) The state court also noted that other evidence supported the reliability of the identification, including: (1) Petitioner's DNA was found on the gun used in the crimes and on a beanie placed over the victim's eyes; (2) Petitioner told his co-defendant Stillwell at 4:00 a.m. he would return but did not because he was arrested at 6:00 a.m.; and (3) when arrested, Petitioner was wearing a sweatshirt which matched the sweatshirt described by the victim, and which could be seen in an ATM camera photograph taken during the kidnapping. (Id. at 12-13 n.4.) Finally, the court noted that the credibility of the identification had been fairly presented to the jury, in that a defense expert testified regarding factors which influence eyewitness identifications, and the circumstances of the victim's inability to identify Petitioner in the photographic lineups (which were shown to the jury), was the subject of thorough cross-examination. (Id. at 13 n.5.)

The Magistrate Judge found that although the record reflected Petitioner and the victim spent one hour together, rather than two hours as stated in the appellate court opinion, the appellate court nevertheless correctly applied clearly established federal law in determining that the victim's identification of Petitioner was reliable.[2] (R&R at 12.) The R&R went on to find that even if the state trial court had erred in admitting the in-court identification at trial, any error was harmless because the victim was extensively cross-examined regarding his inability to identify Petitioner from the photographic lineups, and circumstantial evidence supported the identification in the form of DNA evidence and an ATM camera photograph of a man wearing a sweatshirt that was either identical or very similar to the sweatshirt Petitioner was wearing when arrested. (R&R at 12-13.) Petitioner objects to the Magistrate Judge's findings, arguing that it makes no sense that, if the victim in fact spent so much time with Petitioner under circumstances which permitted a reliable identification, he was unable to identify Petitioner in the two photograph lineups which contained his photograph. (Obj. at 2-3.)

---

[2] Although the Magistrate Judge is correct that the victim testified Petitioner drove him around for a little more than an hour, as detailed below, the evidence supports the appellate court's finding that they were together for over two hours. The victim was abducted about 1:20 a.m., and was taken by Petitioner to three ATMs, with the last ATM receipt time-stamped 3:42 a.m. The Court declines to adopt this finding of the Magistrate Judge.

Petitioner's concern regarding the victim's inability to identify him in the photographic lineups was, as stated in the R&R, considered by the state appellate court under the "totality of the circumstances" test required by clearly established federal law necessary to determine whether the identification was otherwise reliable.  (See R&R at 11, citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).  However, the state court's consideration of evidence pointing only to Petitioner's guilt when determining whether the identification was sufficiently reliable to avoid a due process violation, such as the DNA evidence, is contrary to clearly established federal law holding that such evidence is relevant only in determining if the error was harmless.  See Manson v. Brathwaite, 432 U.S. 98, 116 (1977) (independent circumstantial evidence of guilt "plays no part in our analysis."); see also id. at 118 (Stevens, J., concurring) (cautioning that independent evidence of culpability will not cure a tainted identification procedure, and such evidence should only be considered in determining whether an error was harmless).

Accordingly, the Court declines to adopt the Magistrate Judge's finding that the state appellate court's adjudication of Claim 1 is neither contrary to, nor involves an objectively unreasonable application of, clearly established federal law.  However, based on a de novo review of the state court record, and considering only the appropriate factors to determine whether the identification was otherwise reliable, this Court reaches the same conclusion as the state court.  See Brathwaite, 432 U.S. at 114 (stating that the court should consider "[t]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."), quoting Biggers, 409 U.S. at 199-200 (noting that unnecessary suggestiveness alone does not require exclusion of identification because such a rule would be based on an incorrect assumption that in every instance the admission of such evidence would offend due process).

The victim, who was from Sudan, Africa, and had been living in the United States since 2000, testified that about 1:20 or 1:25 a.m. on February 1, 2007, he was walking from his car to his apartment, crossing Euclid Avenue at a stop sign at an intersection near University Avenue, when a car full of people pulled up to the stop sign.  (Lodgment No. 2, Reporter's Tr. ["RT"]

11cv1165

at 892-97.)  The driver rolled down his window and said, "Excuse me, sir.  I want to get to the freeway.  How can I get to the freeway from here?"  (RT 896-97.)  The victim gave the driver directions and continued walking toward his apartment.  (RT 898.)  As he was walking along the sidewalk, a man from the car approached him from behind and asked for clarification of the directions.  (RT 898-99.)  The victim identified that man in court as Petitioner, and described him to police as a Black male, five-feet, eleven-inches tall, about 200 pounds, 19 or 20 years old, with his hair in cornrows and a handkerchief on his head, wearing a black t-shirt and a blue jacket, or a zippered sweatshirt, with white stripes.  (RT 973, 990, 1431-32.)

When the victim turned around, Petitioner pointed a gun at his forehead and told him to "drop the money."  (RT 899-901.)  The victim said he did not have any money; Petitioner held the gun to the victim's head and told him, "I'm not playing.  Drop the fucking money."  (Id.)  The only items the victim had in his pockets were keys, cigarettes, and an ATM card; Petitioner saw the ATM card and called to someone in the car in an unusual rhyming language.  (RT 902-03, 906, 953.)  The person Petitioner called, a tall, skinny black man, came over carrying a gun, which he then pointed at the back of the victim's head while Petitioner pointed his gun at the victim's chest.  (RT 902-04.)

Petitioner asked the victim where his bank was and where his car was; when the victim told him where his car was parked, Petitioner grabbed the keys from his hand and said, "let's go to the car."  (RT 905-06.)  They walked to the victim's car with Petitioner holding the victim by his arm and pointing a gun at his chest, as the other man held a gun to the back of his head.  (RT 907-08.)  When they reached the car, the two men searched it; Petitioner told the victim to sit in the passenger seat, and then told the men in the car he had come from to follow them.  (RT 907-08.)  Petitioner drove the victim's car, pointing his gun at the victim's chest, while the other man sat in the back seat behind the victim holding his gun to the back of the victim's head.  (RT 909-10.)

Petitioner parked close to a walk-up ATM and told the victim, "you go try to get the money out."  (RT 910-11.)  The victim used the ATM while Petitioner and the other man stayed in the car and pointed their guns at him.  (RT 911-12.)  He returned to the car, showed Petitioner

the receipt, which indicated there was money in the account, and said that he would not be able to take money out until the check he had deposited earlier that day cleared in two or three days. (RT 911.) Petitioner responded by saying, "I need this money" and "get in the car." (Id.) The victim sat in the passenger seat while Petitioner drove; the other car came up along side the driver's side and "they started talking their language." (RT 912.) The victim said he tried to look at the men in the other car, "Because I want to know - know who are they," but Petitioner pushed the victim's face away and told him, "Don't look." (Id.)

Petitioner drove to the College Grove shopping center, pulled into a drive-up ATM, and told the victim to lean over and use the ATM through the driver's window. (RT 913-14.) The receipt was time-stamped 1:43 a.m., and a series of seven photographs taken by the ATM camera were entered into evidence. (RT 914-15.) The victim identified himself, his car, Petitioner, and Petitioner's jacket/sweatshirt in the photographs. (RT 913-17.)

As Petitioner drove them on the 94 freeway, the man in the back asked Petitioner, "Hey, where is that hood at?," and Petitioner removed a beanie from his pocket and handed it to the man in the back, who gave it to the victim and told him to cover his head. (RT 918-19.) The beanie, which was made of sweater material and was later recovered by the police in the victim's car, covered the victim's entire face and he could not see where they were going. (RT 919-20, 994.) As they were driving, the victim asked, "How can you guys do something like that to your own people?" to which Petitioner responded, "I don't give a fuck. Black, white, Mexican. I'm a gangster. I do that for a living. I don't play with men. If I don't get what I need, you're done." (RT 920-21.) The victim told Petitioner he had a three-month old daughter who would have only her mother to look out for her, and Petitioner said, "I don't give a fuck. This is my job. This is what I'm doing for a living." (RT 944.)

After driving ten to fifteen minutes, they pulled into an apartment complex parking lot where the victim was told to remove the beanie. (Id.) He was asked if he knew where he was, and said "No;" he was told they were in Mira Mesa, but he knew he was near Mollison Avenue in El Cajon because he recognized the area. (RT 921-22.) Petitioner sat in the car playing with his gun, spinning the cylinder of the revolver, for about ten minutes, while the victim smoked

one of his own cigarettes and the gunman from the back seat came and went from one of the apartments.  (RT 922-23.)  When the gunman returned and resumed his place in the back seat, the victim was told to put the beanie on and they drove to another apartment complex, where Petitioner removed the car radio and gave it to the gunman in the back seat, who carried it away.  (RT 923-24.)  Petitioner told the victim, "Sorry, I have to do that since we didn't get anything from you.  Now we need this money.  We need anything right now, so, sorry, we're going to take your radio."  (RT 924.)  Petitioner drove the two of them back to the first apartment complex near Mollison Avenue with the beanie over the victim's eyes.  (RT 924-25.)

When they arrived, Petitioner told the victim he could take the beanie off; they waited two or three minutes, and Petitioner told the victim to put the beanie back on and drove them to an ATM, where he told the victim to get out and try to retrieve money.  (RT 925.)  The victim took off the beanie and saw they were on Second Street in El Cajon, an area he was familiar with, and he walked up to the ATM while Petitioner stayed in the car pointing his gun at him.  (RT 925-26.)  The ATM receipt indicated the victim used it at 3:42 a.m.  (RT 935.)  He was unable to retrieve money and returned to the car; Petitioner said, "I need this money.  How long have you been having this ATM?"  (RT 925-26.)  The victim said it was his wife's card, and she had it for two years.  (RT 926.)  Petitioner replied, "How come – how come you can't get the money?  I need this money today.  You put in this money.  We have to go to the mall tomorrow.  I want to buy gold and clothes and shoes by this – you have – you have to use it."  (RT 927.)  When the victim said he was not sure he would be able to use the card, Petitioner got "really angry," grabbed him by the front of his shirt, pointed the gun at his head, and said, "I will shoot right now.  You trying to mess with me right now.  Don't waste my – don't waste my time.  Do you want to have kids?"  (RT 927-28.)  The victim said he wanted to have more children, and Petitioner replied, "I will just shoot you in your balls so you can't have kids no more.  Man you piss me off, man.  This – this – this is how I do for a living.  Don't waste my time.  I'm going to kill you, man.  I don't play with money."  (Id.)

The victim said he was really scared and that he tried to calm Petitioner down by putting his hands up with his palms out, and told him, "Okay.  Okay.  Tomorrow I will take you to the

11cv1165

mall.  You can buy anything you want.  I will try my best to use this card or to get the money.  Take everything you want."  (RT 928.)  Petitioner calmed down and drove them to another apartment complex near Mollison Avenue and Madison Street with the victim wearing the beanie.  (RT 928-29.)  Petitioner parked the car and told the victim to take the beanie off;  Petitioner got out of the car, walked about 20 feet away, and talked to two Black men; one was short and dark and the other skinny and light-skinned.  (RT 929-30.)  Petitioner returned, told the victim to put the beanie on, and drove away; while they drove, Petitioner spoke with a new man who had gotten into the back seat directly behind the victim, who the victim identified as Stillwell.  (RT 930-31, 938.)  They drove to an apartment complex at 660 South Mollison Avenue in El Cajon.  (RT 931, 940.)  Testimony from an FBI agent established it to be adjacent to Petitioner's downstairs apartment at 642 South Mollison Avenue.  (RT 1556, 1560-61.)

Petitioner told the victim, who was still wearing the beanie, "My soldier's going to watch you," and gave his gun to Stillwell, who said, "I'm going to watch you."  (RT 935.)  Petitioner told Stillwell that the victim was "cool," but if he did something wrong, "just go ahead and blow his head off."  (RT 937.)  Petitioner asked the victim if he wanted to use the bathroom or have something to drink, and the victim took the beanie off and asked for water.  (RT 935-36.)  Petitioner walked away and returned with water in a fast-food restaurant cup which he gave to the victim; he then told the victim that if he wanted to use the bathroom to tell Stillwell.  (RT 936.)  Petitioner said he was going to go upstairs and go to sleep, and walked away; the victim urinated next to the car with Stillwell's permission.  (RT 939-40, 1452)

Stillwell and the victim sat in the car from about 4:00 a.m. until 8:00 a.m., but Petitioner never returned; Stillwell was talking to himself during that time wondering why Petitioner did not return.  (RT 944-46.)  Stillwell told the victim that if he got money out of the bank he would let him go, and the victim agreed; Stillwell attempted to drive the car, but could not, and the victim drove them out of the apartment complex parking lot.  (RT 946-47.)  As the victim was driving and following Stillwell's directions, he saw a police officer on a motorcycle at a stop sign; he parked the car in front of the officer, jumped out, and said he had been kidnapped.  (RT 947.)  Stillwell ran but was caught and his gun recovered; the victim identified him later that day.

11cv1165

(RT 947-50, 984.)  Also later that day, when he was "really tired," the victim was asked to look at a set of photographs in order to identify the man who abducted him; he said he was not sure but that it might be one of the people.  (RT 991.)  He did not see Petitioner again until the preliminary hearing.  (RT 984-85.)

Cross-examination of the victim involved how well he remembered the events that day, small discrepancies between his preliminary hearing and trial testimony, and why, although he was in close contact with Petitioner, even leaning over him at one point to use the ATM, he gave only a general physical description to the police and had identified him at the preliminary hearing only by his lips and face.  (RT 953-76.)  The victim was cross-examined regarding his inability to pick Petitioner out of the photographic lineups, a discrepancy in the color of the jacket he said Petitioner wore that night, the length of time between the crime and his identification three and one-half months later, and why the cup Petitioner used to bring him water, which was left in the car, was never found.  (RT 977-89.)

As noted above, where a lineup is suggestive, clearly established federal law provides that a Court should consider: "[t]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation."  Brathwaite, 432 U.S. at 114.  "Against these factors is to be weighed the corrupting effect of the suggestive identification itself."  Id.

A de novo review of the state court record shows that the victim had an excellent opportunity "to view the criminal at the time of the crime."  Id.  The victim and Petitioner were face-to-face several times.  At one point Petitioner grabbed the victim by the front of his shirt and threatened him, and the victim leaned over Petitioner to use an ATM.  The "witness' degree of attention" id., was sharp and serious, as he testified that he looked at the other people with Petitioner because he wanted to know who they were, and was able to describe them at trial.  In fact, he was so attentive that he caused Petitioner to physically turn the victim's head away and tell him not to look, and may have inspired the gunman in the back seat to make the victim wear Petitioner's beanie to prevent him from seeing where they went.

The "accuracy of [the victim's] prior description of the criminal," id., also supports a reliable identification, in that there was no challenge to it other than defense counsel bringing out on cross-examination that the victim's initial description of Petitioner was somewhat lacking in detail. However, the physical description and estimated age of the abductor reported by the victim immediately after the crimes is generally consistent with the physical description of Petitioner set forth in the probation officer's report. (Compare RT 973 with CT 94.) Even to the extent the victim identified Petitioner in court only by his face and lips (RT 974-77), Petitioner wore a handkerchief on his head during the crimes.

The "level of certainty demonstrated at the confrontation," Brathwaite, 432 U.S. at 114, also supports a finding of reliability, as the victim's identification of Petitioner at the preliminary hearing was direct and unqualified. (RT 14.) The final factor, the three and one-half month period between the crime and the identification, is not as strong as the other factors. See Brathwaite, 432 U.S. at 116 (noting that the victim described the perpetrator to the police within minutes of the crime and the photographic identification took place two days later, and "[w]e do not have here the passage of weeks or months between the crime and the viewing of the photograph."); but see Biggers, 409 U.S. at 201 (acknowledging that a delay of seven months "would be a seriously negative factor in most cases," but less so when the victim had made no previous identification, and therefore had a good record for reliability by having previously resisted whatever suggestiveness inheres in lineups.)

At least four of the factors weigh heavily in favor of a reliable identification, and the fifth factor does little to lighten the load. The Court finds that the substantial weight of the five Biggers factors is not outweighed by the "corrupting influence" of allowing the victim to view Petitioner for the first time in the courtroom, in jail clothing, seated at the defense table next to Stillwell, who the victim had already identified as one of the perpetrators. The identification was sufficiently reliable to avoid a federal due process violation by its introduction at trial. See Brathwaite, 432 U.S. at 114 (holding that the ultimate goal is to determine whether there is a very substantial likelihood of irreparable misidentification and, short of that, the identification testimony is properly received and any flaws in the procedure are for the jury to weigh).

The Court finds, based on a de novo review of the record, that the victim's identification of Petitioner was reliable notwithstanding the procedures used, and that federal habeas relief is unavailable with respect to Claim 1 because Petitioner has not demonstrated that his federal Constitutional rights were violated by the introduction at trial of the victim's identification.  Id.; see Fry v. Pliler, 551 U.S. 112, 119-22 (2007) (holding that a federal habeas petitioner must show a constitutional violation even if § 2254(d) has been satisfied); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc) (same).

The Magistrate Judge also found that, assuming a federal Constitutional error occurred, it was harmless because there was substantial circumstantial evidence that the identification was reliable in the form of the DNA evidence and the ATM photographs of Petitioner wearing the same sweatshirt or jacket he was wearing when arrested, and because the evidence undermining the identification, in the form of the photographic lineups, was presented to the jury and was the subject of expert testimony and extensive cross-examination.  (R&R at 12-13, citing Williams v. Stewart, 441 F.3d 1030, 1039 (9th Cir. 2006) (applying harmless error to identification made under suggestive circumstances).)  Petitioner objects to that finding, arguing that the error was harmful because there is no doubt the jury was influenced more by the in-court identification than by the circumstantial evidence relied on by the Magistrate Judge.  (Obj. at 3-4.)

Habeas relief is not available "unless the error resulted in 'substantial and injurious effect or influence in determining the jury's verdict,' . . . or unless the judge 'is in grave doubt' about the harmlessness of the error."  Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004), quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) and O'Neal v. McAninch, 513 U.S. 432, 436 (1995).  The Magistrate Judge correctly observed that, in addition to the DNA and ATM camera evidence, the circumstances of the identification procedure were fairly placed before the jury, who were instructed (CT 67-68) on evaluating eyewitness identification and presented with defense expert testimony (RT 1239-47) which called into question the accuracy and validity of the identification.  The Court adopts that finding with the following modification.  In addition to the items identified by the Magistrate Judge, there was no dispute that the perpetrator: (a) matched Petitioner's physical description; (b) parked the victim's car near Petitioner's

apartment and walked away; and (c) was arrested at his nearby apartment while Stillwell and the victim were waiting for him to return to the car.  Assuming the jury was not presented with the victim's in-court identification, they would still have been presented with strong evidence of guilt.  They were also presented with the ATM photographs showing the abductor, who was wearing the same or similar jacket or sweatshirt Petitioner was wearing when arrested, and the jury could have made  their own identification.  The Court does not have a "grave doubt" whether any error in introducing the victim's in-court identification had a substantial and injurious effect or influence on the jury's verdict.  In sum, habeas relief is denied as to Claim 1 because Petitioner has not demonstrated that a federal Constitutional violation occurred, and because any error was harmless.

Petitioner alleges in a related but unenumerated claim that his trial counsel rendered constitutionally deficient performance in failing to request a live lineup before the preliminary hearing, or to otherwise take measures to avoid the suggestive in-court identification.  (Pet. Mem. at 15-19.)  Respondent does not address this claim in the Answer, and it was not addressed by the Magistrate Judge.  The Court will address it in the first instance.

This claim was presented to the state supreme court in the petition for review and to the appellate court on direct appeal.  (Lodgment No. 3 at 15-19; Lodgment No. 7 at 17-20.)  The Court will apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

> Taylor asserts he received ineffective assistance of counsel because his attorney did not request a live lineup before the preliminary hearing, or otherwise avoid a suggestive identification at the preliminary hearing.  Taylor contends that without the suggestive identification at the preliminary hearing, the jury would have discounted the accuracy of Taylor's identification at trial, which took place almost 18 months after the crime.
>
> Upon timely request, a criminal defendant may be afforded a pretrial lineup if eyewitness identification is a material issue at trial and there is a reasonable likelihood of a mistaken identification which a lineup would tend to resolve.  (*People v. Farnam* (2002) 28 Cal.4th 107, 183, citing *Evans v. Superior Court* (1974) 11 Cal.3d 617, 625; see also *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1155.)  If a defendant anticipates that an in-court identification may be suggestive, the remedy to avert any prejudice that may result from the suggestive courtroom procedure is to demand that a lineup be conducted before the in-court identification.  (*Evans*, at p. 625; *People v. Harmon* (1989) 215 Cal.App.3d 552, 568; *People v. Green* (1979) 95 Cal.App.3d 991, 1004.)
>
> Kukukafi was unable to identify Taylor in two photo lineups.  Cutter [Petitioner's original trial counsel] stated that as her investigation proceeded, she

focused on identity issues as the primary defense to the criminal charges. The record supports the conclusion that counsel's decision not to request a live lineup, either as a precaution or a remedy, was a tactical decision and did not constitute ineffective assistance of counsel. Had Kukukafi identified Taylor in a live lineup prior to the preliminary hearing, the resulting identification would have undermined the defense case. Thus the defendant does not show counsel's performance was deficient under an objective standard of professional reasonableness. (*Ledesma*, *supra*, 43 Cal.3d at p. 216; *Strickland*, *supra*, 466 U.S. at pp. 687-688.)

Further, assuming counsel made an unprofessional error, Taylor does not show prejudice. (*Strickland*, *supra*, 466 U.S. at p. 687.) In view of the reliability of Taylor's identification (discussed *ante*, pp. 10-14), it is reasonably probable Kukukafi would have identified Taylor at a live lineup. As we have explained, Kukukafi had the opportunity to observe Taylor for more than two hours. They sat next to each other in the car. They talked. Kukukafi remembered features of Taylor's face and was certain about his identification. (See, e.g., *Moody*, *supra*, 564 F.3d at p. 763; *Rivera-Rivera*, *supra*, 555 F.3d at p. 284; *Romero*, *supra*, 44 Cal.4th at p. 400.) This is a far different situation than a witness who had only a few seconds to observe an unknown perpetrator or whose view of the perpetrator was partially obscured. (*United States v. Russell* (6th Cir. 1976) 532 F.2d 1063, 1066 ("There is great potential for misidentification when a witness identifies a stranger based solely upon a single brief observation. . . .").)

In view of the circumstances presented here, the potential for misidentification was minimal. Thus Taylor does not show on appeal there is a reasonable probability the result of the proceeding would have been different had he participated in a live lineup prior to the preliminary hearing or otherwise avoided a suggestive identification at the preliminary hearing. (*Ledesma*, *supra*, 43 Cal.3d at p. 216; *Strickland*, *supra*, 466 U.S. at p. 687.)

(Lodgment No. 6, <u>Taylor</u>, No. D055375, slip op. at 26-27.)

For ineffective assistance of counsel to provide a basis for federal habeas relief, Petitioner must demonstrate two things. First, he must show that counsel's performance was deficient. <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> Second, he must show counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." <u>Id.</u> To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error. <u>Id.</u> at 694. A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u> Petitioner must establish both deficient performance and prejudice in order to establish ineffective assistance of counsel. <u>Id.</u> at 687.

"Surmounting <u>Strickland</u>'s high bar is never an easy task." <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371 (2010). "The standards created by <u>Strickland</u> and section 2254(d) are both 'highly deferential' and when the two apply in tandem, review is 'doubly' so." <u>Harrington v. Richter</u>, 562 U.S. ___, 131 S.Ct. 770, 788 (2011) (citations omitted). These standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt." <u>Cullen v. Pinholster</u>, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011). Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction. <u>Richter</u>, 131 S.Ct. at 786, quoting <u>Jackson v. Virginia</u>, 443 U.S. 307, 332 n.5 (1979). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." <u>Strickland</u>, 466 U.S. at 687.

The state appellate court's finding that counsel made a tactical decision not to request a live lineup prior to the preliminary hearing because, had the victim identified Petitioner in such a lineup the resulting identification would have undermined the defense case, is supported by the record and entitled to deference. At the time of the preliminary hearing, the victim had failed to identify Petitioner in two photographic lineups which contained his photograph, and had chosen someone from a photographic lineup which did not contain his picture. Thus, the defense was in a position to argue, both at the preliminary hearing and at trial, that Petitioner was the subject of an unreliable identification, and a live lineup risked weakening that argument. In fact, the defense expert on identification procedures testified that in-court identifications such as the one conducted in this case are "totally" invalid, and that the witness' inability to identify the perpetrator in the two photographic lineups containing Petitioner's photograph viewed near the time of the crime further weakened the identification. (RT 1247-52.) The authority relied on by the state court regarding a defendant's right to a pretrial lineup arises from a right not to be detained based on identification without a chance to challenge that evidence, which is lessened where, as here, there was independent evidence of guilt in the form of the DNA evidence, the ATM photographs, and, as discussed below, although excluded at trial, Stillwell's police statement implicating Petitioner. See <u>Evans</u>, 11 Cal.3d at 625 ("The right to a lineup arises,

however, only when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve.")

As there is no indication in the record that the victim would not have identified Petitioner at a live lineup prior to the preliminary hearing, and every indication he would have, the defense strategy had the effect of bolstering their expert's opinion that the identification was invalid, whereas a lineup may have damaged the defense of misidentification. The record supports the state court's finding that it was unlikely the victim would not have identified Petitioner had a live lineup been conducted or had counsel taken measures to prevent the victim from seeing Petitioner seated next to Stillwell wearing jail clothing. Thus, the state court's findings that Petitioner's counsel was not deficient, and that Petitioner was not prejudiced by counsel's actions, is supported by the record and entitled to a high degree of deference.

The Court denies habeas relief as to Petitioner's claim that trial counsel rendered constitutionally ineffective assistance in failing to request a live lineup prior to the preliminary hearing, or taking measures to avoid the victim seeing Petitioner for the first time sitting next to Stillwell in the courtroom wearing jail clothing. The state court adjudication of that claim did not involve an unreasonable application of Strickland. See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000) (holding that an ineffective assistance of counsel claim under Strickland "should be analyzed under the 'unreasonable application' prong of section 2254(d).")

**2.    Claim 2**

Petitioner alleges in Claim 2 that he received ineffective assistance of trial counsel when counsel decided not to call potential defense witnesses without interviewing them, including Petitioner's mother (Melissa Cherry), his two older brothers (Anthony and Deron Taylor), and co-defendant Stillwell. (Pet. at 7; Pet. Mem. at 24-29.) Respondent argues that the state court correctly found that counsel had made a strategic choice, based on a reasonable investigation, not to call these witnesses, and that in any case Petitioner cannot show he was prejudiced by that decision in light of the overwhelming evidence of his guilt. (Ans. Mem. at 28-29.)

The state court found that counsel's decision not to call Stillwell as a witness was reasonable because his statements were inconsistent and potentially harmful to the defense.

(Lodgment No. 6, <u>Taylor</u>, No. D055375, slip op. at 30.)  The state court found that although counsel did not interview the family members, it was reasonable for counsel to rely on their written statements, which were made to and summarized by Petitioner's prior defense counsel's investigator, on the basis that state law does not obligate counsel to independently verify investigatory reports.  (<u>Id.</u> at 30-31.)  The appellate court also found that the statements of the family members revealed their testimony would have made an alibi defense problematic because their statements, which would have had to have been turned over to the prosecution, included inconsistencies that "had the potential to undermine what [counsel] determined was Taylor's strongest defense - challenging the eyewitness identification - by presenting a weak alibi defense."  (<u>Id.</u>)

The Magistrate Judge found that the state court's adjudication of this claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, stating:

> Here, Petitioner's initial trial counsel, Courtney Cutter, ordered interviews of Petitioner's mother and two brothers.  Lodgment 2, Vol. 16 at 1834.  After reviewing the transcripts of those interviews, Petitioner's second trial counsel, Neil Besse, who ultimately represented Petitioner at trial, decided against calling Petitioner's mother and two brothers because he was concerned their testimony would not withstand cross examination.  Lodgment 2, Vol. 16 at 1834.  Furthermore, Besse explained that his decision to not call Larry Stillwell as a witness was based on Stillwell's prior statement to police that Taylor was the kidnapper.  <u>Id.</u> at 1136.  In addition, Besse testified that he made a tactical decision to focus his client's defense on the government's burden of proof.  <u>Id.</u> at 1836.  Hence, Petitioner cannot show that his trial counsel's performance fell below an objective standard of reasonableness.  [Footnote:  Moreover, as discussed in the next section, Petitioner has not and cannot establish prejudice in light of the overwhelming evidence of guilt.]

(R&R at 16.)

Petitioner objects to these findings, arguing that counsel was deficient in relying on the witness statements prepared by another attorney's investigator.  (Obj. at 4-5.)  He argues that counsel failed to adequately investigate the alibi defense, and abandoned the defense based on someone else's opinion of the witnesses' usefulness.  (<u>Id.</u>)

Petitioner must overcome a strong presumption that it was a strategic choice by defense counsel to forgo an alibi defense in favor of presenting a defense based on a challenge to the identification.  <u>See</u> <u>Strickland</u>, 466 U.S. at 689 ("There are countless ways to provide effective

assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.")  However, in determining whether counsel's strategic choice was reasonable, the Court must first consider whether that decision was based on a reasonable investigation.  Id. at 690-91 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.")  A decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 691; Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999) ("A lawyer who fails to adequately investigate, and to introduce into evidence, records that demonstrate his client's factual innocence, or that raise sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance.")

The Magistrate Judge did not address the threshold issue of the reasonableness of trial counsel's investigation, which, as explained below, was deficient.  The Court declines to adopt the findings with respect to Claim 2, and will consider the claim in the first instance.

As outlined above, the victim was walking home about 1:20 a.m. when he was abducted by Petitioner at gunpoint; he was taken at gunpoint to three ATMs but was unable to withdraw money, and had the radio stolen from his car.  Petitioner spoke to the people assisting him in a language the victim did not understand, which a gang expert testified was the type of slang used by criminal street gangs.  (RT 1362.)  After leaving the victim in the care of his "soldier" Stillwell with instructions to "blow [the victim's] head off" if he did anything wrong, Petitioner left and never returned.  They waited for Petitioner to return from around 4:00 a.m. until about 8:00 a.m., but unbeknownst to them he had been arrested at his nearby apartment at 6:00 a.m. by the FBI pursuant to an unrelated arrest warrant.[3]  (RT 1556.)

Stillwell made a statement to the police the day he was arrested, which was excluded at trial (RT 756), that he was at a friend's house when he was picked up by a friend and fellow West Coast Crips gang member who he referred to by his gang moniker; the prosecution gang expert recognized the gang moniker given by Stillwell as belonging to Petitioner, and Stillwell

---

[3]  According to the District Attorney, Petitioner was arrested for and charged with federal firearms trafficking, and the United States Attorney agreed to dismiss the charges without prejudice to allow the state to prosecute Petitioner first.  (CT 168.)

identified Petitioner from a photograph as the fellow gang member to whom he had referred. (CT 96; RT 92-95; Lodgment No. 1, Supplemental Clerk's Tr ["Supp. CT"] at 6.) Stillwell said Petitioner drove him and the victim to an apartment complex where he handed Stillwell a gun, told Stillwell "he was his young soldier," and promised to give Stillwell something if he watched the victim. (CT 96.) Stillwell said he sat in the car with the victim from 4:00 a.m. until 8:00 a.m., when they left to get money, and was arrested after running from the car. (Id.)

Prior to Petitioner's trial, Stillwell pleaded guilty to one count of kidnapping for robbery, and admitted he had been personally armed with a firearm and had committed the offense in connection with a criminal street gang. (Lodgment No. 1, Augmented Clerk's Tr. ["Aug CT"] at 3-6.) Stillwell wrote a letter to Petitioner's trial counsel prior to trial stating that his attorney had prevented him from contacting Petitioner's first attorney, and he was now acting on his own initiative; he said he was willing to testify that Petitioner was not involved in the crimes, that he had been high on PCP and not advised of his rights when he made the police statement, during which he had been threatened, pressured and badgered into identifying Petitioner, and that he had agreed to a plea deal for 18 years in prison which required him to serve 85% of that term. (CT 125.) Stillwell provided a statement in support of a new trial motion, about nine months after Petitioner's trial, that he had been willing to testify that he borrowed from Petitioner both the beanie used to cover the victim's eyes and the sweatshirt seen in the ATM photographs taken at 1:43 a.m., that he had kept the beanie but returned the sweatshirt to Petitioner at his home around 1:00 or 2:00 a.m., and that the gun used in the crime belonged to Stillwell, but Petitioner had played with it and "dry fired" it earlier that evening. (Aug. CT 7.)

Petitioner's mother provided a statement to a defense investigator before trial stating that Petitioner came home about 8:30 p.m. from having his hair braided, and after speaking to him alone in the living room she went to sleep in her bedroom; she awoke to use the restroom about midnight and saw Petitioner asleep on the living room sofa with his brother Anthony asleep on the floor next to him. (CT 128.) She said she went back to sleep and that she knew nothing of Petitioner's whereabouts from midnight until 4:00 a.m., at which time she was awakened by the sound of people "rambling," and encountered Petitioner and Stillwell, who she referred to as

1  Petitioner's step-brother, talking to each other in the living room. (Id.) Stillwell told her he was

2  there to return Petitioner's jacket, but she did not see the jacket. (Id.)

3  Petitioner's brother Anthony said Petitioner came home about 8:30 p.m. and fell asleep

4  in the living room sometime before Anthony fell asleep next to him about 10:30 p.m.; Anthony

5  said he did not remember seeing Stillwell at the apartment. (CT 130-31.)  Anthony said

6  Petitioner was still asleep when Anthony awoke for a short time and played video games about

7  1:30 or 2:00 a.m. (Id.) Petitioner's brother Deron said Petitioner arrived home about 8:30 p.m.,

8  and Stillwell came to the house about 9:00 p.m. to borrow a jacket from Petitioner. (CT 132.)

9  When Deron awoke about 2:00 a.m., he saw Petitioner and Anthony asleep in the living room,

10 and went back to sleep. (CT 133.)

11 Petitioner argues that these witnesses, had they testified at trial, could have established

12 that he was home asleep when the victim was abducted around 1:20 a.m., could have explained

13 why Petitioner's jacket was seen in an ATM camera photograph taken at 1:43 a.m. (Stillwell was

14 wearing it), and could have explained why Petitioner's DNA was found on the beanie used to

15 cover the victim's eyes and the gun used by Stillwell (the beanie belonged to Petitioner and/or

16 the items were exposed to Petitioner's DNA during Stillwell's visit). (See Pet. at 34-35.)

17 Petitioner's trial counsel, Neil Besse, testified at a new trial motion nearly a year after

18 trial. Besse stated that he had reviewed the family witness statements prior to trial, which were

19 prepared by the investigator hired by Petitioner's prior counsel Courtney Cutter, and the

20 following exchange took place with the prosecutor questioning Besse:

21 Q.     Did you consider calling [Petitioner's mother and two brothers]?

22 A.     Yes.

23 Q.     And was it a tactical decision on your part not to?

24 A.     Yes.

25 Q.     What was your, um, thoughts behind that tactical decision?

26 A.     The thoughts behind the decision involve, I guess, well, the usual
       thoughts. [¶]  We're required to turn their statements over. Ah, we

27     had turned them over, as I recall; um, but if we hadn't, to use them,
       I would have had to turn the statements over.  And then, of course,

28     the district attorney has the ability to cross-examine the witnesses;
       and, it will become a question of how well the witnesses holds [sic]

-20-

1    up under cross-examination and whether, innocently or not, they
     trip over themselves, which sometimes happens.
2
     It's not to say that they weren't telling the truth.  But even truthful
3    testimony gets twisted and contorted as each side pushes and pulls
     on the witness and it looks like they're lying, whether they are or
4    not.  Then we've undertaken the burden and failed at doing so.

5    So contrasted with the idea of focusing solely on the district
     attorney's burden, not undertaking the burden ourselves, it was my
6    decision not to call the witnesses.

7   (Lodgment No. 2, Reporter's Tr. ["RT"] at 1835-36.)

8          The following exchange took place on cross-examination where counsel appointed for

9   Petitioner for the new trial motion questioned Besse:

10         Q.    You continue with the theory of the case, as defined in these
                 investigative reports, that Mr. Stillwell not only came over that
11               evening and borrowed some clothes, he had a gun with him which
                 he showed the client, Mr. Taylor.
12
           A.    That was our - was that in the investigation request, are you asking?
13
           Q     In the defense theory of the case in the form entitled "Investigative
14               Request."

15         A.    Okay.

16         Q.    And that he showed it to Mr. Taylor, and Mr. Taylor actually
                 handled the gun.
17
           A.    Right.
18
           Q.    And that several family members can verify that Mr. Taylor was at
19               home from about 9:00 p.m. until his arrest the following morning.

20         A.    Yes.

21         Q.    And, so, at least according to the investigative request, that was the
                 defense theory of the case.
22
           A.    That was – at one point, yes.
23
           Q.    Okay.  And that was Miss Cutter's theory of the case.  And at least,
24               according to the investigator requests that you filled out, it was your
                 theory, up to a point.  [¶]  And then I'll get your testimony that you
25               then changed the theory of the case.

26         A.    Well, not really.  I mean, certainly, it was a "I didn't do it" theory
                 as opposed to, as suggested, duress or consent by the victim, like,
27               they were really friends the whole time; the victim was lying.  [¶]
                 I mean - so our theory was the victim's not lying.  What happened
28               to him did happen to him, but we have no - my defense became we
                 have no idea who did it.

1    Q.    Right.  But before that defense - the defense, at least according to the action requests, was more of an affirmative putting on proof, such as alibi witnesses and maybe even Mr. Stillwell, if he testified, to put on and fulfill the statements that were made in the defense theory of the case.  At least according to the investigative requests.

4    A.    Yes.  Clearly that was an early theory of the case.

5    Q.    Right. [¶]  And you were going to use, ah, the so-called, what you call, alibi witnesses, which would be Miss Cherry and Mr. Taylor's two brothers; right?"

7    A.    I don't know that anyone made a decision to use them but they were explored and that's why their statements were taken.

Q.    And you said that you - you turned those statements over to Ms. Diaz [the prosecutor].  Or you don't remember?

A.    I don't know if I did or not.  If I wasn't calling them, I would imagine I did not.  But - I just don't know.

Q.    Do you know if Miss Cutter turned them over?

A.    I don't know.

Q.    And did you, um - when you got on to the case in April and it was tried a couple months later, did you go out and reinterview the alibi witnesses Miss Cherry or Mr. Taylor?  I mean, do you remember Deron Taylor, Anthony Taylor?

A.    I never, that I recall, spoke to the two brothers Anthony or Deron.  I did speak with the mother, um, Miss Cherry.  And I cannot remember - I want to say that we did discuss some of the facts on one of the phone calls, but I didn't record them.  So I can't even say with certainty that we did that.

Q.    But its fair to say you didn't have - you didn't attempt to, like, cross - practice cross-examination of these alibi witnesses to see whether they hold up at trial or not?

A.    Correct.

Q.    Did, ah - did you make any investigative requests to try to interview a Mr. Haskins, who was also located in the residence, ah, at the time of the crime?

A.    No, I did not.

(RT 1861-64.)

    As set forth below, the record supports the state court's finding that counsel made a reasonable tactical decision not to call Stillwell, a felon and fellow gang member who would have been impeached with his police statement implicating Petitioner and by their relationship.

11cv1165

However, the record does not support the state court's finding with respect to the family members. The state court found, because of the inconsistencies in the witness statements of the family members, and because the statements would have had to have been turned over to the prosecution if the witnesses testified, that:

> Besse made a reasonable tactical decision when he determined that the family's testimony had the potential to undermine what he determined was Taylor's strongest defense -- challenging the eyewitness identification -- by presenting a weak alibi defense. [¶] . . . Besse's strategic choice not to pursue an alibi defense was a reasonable decision that made further investigation unnecessary, and did not constitute ineffective assistance of counsel.

(Lodgment No. 6, <u>Taylor</u>, No. D055375, slip op. at 32.)

Counsel could not have made such a determination without interviewing the family members. As the Ninth Circuit has observed:

> Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial. A witness's testimony consists not only of the words he speaks or the story he tells, but also of his demeanor and reputation. A witness who appears shifty or biased and testifies to X may persuade the jury that not-X is true, and along the way cast doubt on every other piece of evidence proffered by the lawyer who puts him on the stand. But counsel cannot make such judgments about a witness without looking him in the eye and hearing him tell his story.

<u>Lord v. Wood</u>, 184 F.3d 1083, 1095 (9th Cir. 1999); <u>see id.</u> at n.8 ("Counsel is not obligated to interview every witness personally in order to be adjudged to have performed effectively. However, where (as here) a lawyer does not put a witness on the stand, his decision will be entitled to less deference than if he interviews the witness.") (citations omitted).

The state court correctly observed that the written witness statements of the family members would have had to have been disclosed to the prosecution had they testified, and would have "allowed the prosecution to exploit the weaknesses and inconsistencies in the statements that Taylor's family members made to the defense investigator." (Lodgment No. 6, <u>Taylor</u>, No. D055375, slip op. at 31.) The record does not, however, support a finding that counsel was fully aware of what impact those "weaknesses and inconsistencies" would have had on the alibi witnesses, if any, had they testified at trial, because counsel never interviewed them or practiced cross-examining them, and was not in a position to support his confessed concern that they might

not hold up under cross-examination. In fact, as far as the record reflects, counsel merely relied on a summary of the family members' statements they made to a defense investigator hired by Petitioner's former attorney, and did not even know if they had already been turned over to the prosecution. In addition, counsel made no effort to locate Casnedo Haskins, who the brothers said is their cousin and was at the apartment that night, although the statements indicate that Haskins did not come out of the bedroom that evening and may have attempted to avoid being located.[4] (CT 130-33.)

The Court finds that the state appellate court's determination that Petitioner's trial counsel conducted a reasonable investigation before deciding not to call the family members as witnesses without first interviewing them (on the basis that counsel had determined, based on the statement summaries alone, that the witnesses had the potential to undermine what counsel thought would be the strongest defense), involved an unreasonable application of the Strickland performance prong. However, in order to obtain federal habeas relief, Petitioner must also establish prejudice. See Fry, 551 U.S. at 119-22 (holding that a federal habeas petitioner must show a constitutional violation even if § 2254(d) has been satisfied); Strickland, 466 U.S. at 687 (both deficient performance and prejudice must be shown in order to establish constitutionally ineffective assistance of counsel).

Because the state court did not reach the prejudice prong of the Strickland standard, this Court must analyze that prong de novo. Rompilla v. Beard, 545 U.S. 374, 390 (2005), citing Wiggins v. Smith, 539 U.S. 510, 534 (2003). The Court is mindful that even under a de novo review, "judgments of conviction and sentence carry a presumption of finality and legality and may be set aside only when a state prisoner carries his burden of proving that [his] detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." Hayes v. Brown, 399 F.3d 972, 978 (9th Cir. 2005) (en banc). In addition, "[t]he standards created by Strickland . . . [are] 'highly deferential,' Richter, 131 S.Ct. at 788, and "difficult to meet." Pinholster, 131 S.Ct. at 1398. Federal habeas relief functions as a "guard

---

[4] The FBI agent who arrested Petitioner testified that Petitioner, Haskins, Anthony, Devon, and Petitioner's mother were in the residence when the arrest warrant was served at 6:00 a.m. (RT 1559.)

against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction.  <u>Richter</u>, 131 S.Ct. at 786, quoting <u>Jackson</u>, 443 U.S. at 332 n.5.

To show prejudice, Petitioner must establish that "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable."  <u>Strickland</u>, 466 U.S. at 694.  He must show a reasonable probability that the result of the proceeding would have been different absent the error, that is, "a probability sufficient to undermine confidence in the outcome."  <u>Id.</u>

Petitioner was clearly not prejudiced by counsel's failure to interview or call Stillwell as a witness.  Cutter, Petitioner's original attorney, testified at the new trial motion she initially considered calling Stillwell as a witness to testify he went to Petitioner's house, borrowed clothing, showed Petitioner the gun, and in general the two of them knew each other well enough to explain why Petitioner's DNA was found on the beanie used to cover the victim's face and on the gun Stillwell used to commit the offenses.  (RT 1795-96.)  Cutter said that Stillwell's attorney refused permission to interview Stillwell, but Stillwell attempted to communicate with her when she visited Petitioner in the holding tank, and had communicated through family members (Cutter said Stillwell and Petitioner were related in a manner she never understood), that he would be willing to testify to those facts, and that Cutter had hoped Stillwell would plead guilty (Cutter knew that Stillwell was preparing to plead guilty) prior to Petitioner's trial so he could be a witness.  (RT 1798-99.)  Cutter handed the case off to Besse before Cutter had decided whether to call Stillwell, although Cutter said she would have interviewed Stillwell after his guilty plea had she kept the case.  (RT 1800-01.)

Besse testified he made a strategic decision not to call Stillwell, without interviewing him, because he was aware Stillwell had made a statement to the police implicating Petitioner which would come out if he testified, and because Stillwell had obvious bias and credibility problems in light of his gang membership, his family relationship with Petitioner, and his prior criminal offenses involving moral turpitude.  (RT 1866-74.)  The gang expert testified that Stillwell and Petitioner were both documented members of the West Coast Crips street gang.  (RT 1306-32.) Stillwell admitted when he pleaded guilty that he had kidnapped and robbed the victim in connection to a criminal street gang.  (Aug. CT 2-3.)  Stillwell told the police upon his arrest that

a gang member gave him the gun he used and called him his soldier.  Stillwell identified Petitioner's photograph as that gang member. (CT 96, 128.)  In light of Stillwell's danger to the defense and his susceptibility to impeachment, even considering the post-trial statement he made to a defense investigator outlined above (Aug. CT 7), Petitioner has not shown "a probability sufficient to undermine confidence in the outcome" had Stillwell been interviewed or called to testify.  Strickland, 46 U.S. at 694.

Petitioner's mother indicated that she was unable to say where Petitioner was between midnight and 4:00 a.m., but that "she was awakened at around 4:00 a.m. by the sound of people 'rambling,'" and found Petitioner and Stillwell talking with each other in the living room. (CT 128.)  Although she said Stillwell told her he was there to return Petitioner's jacket, she did not see the jacket. (CT 128-29.)  Thus, her testimony would not have provided Petitioner with an alibi, but would have placed Petitioner and Stillwell together, not only about the same time the victim said they were together, but near where the perpetrator had parked the victim's car.  Her statement also conflicted with Anthony's statement that he was asleep next to Petitioner but did not wake up when their mother said Stillwell and Petitioner made so much noise that they woke her in her bedroom.  Even if her testimony had the potential to be used to argue an innocent explanation as to why Petitioner's DNA was found on the gun and beanie (because Stillwell was in Petitioner's home), it would have conflicted with the victim's testimony that Petitioner met Stillwell in the parking lot about 4:00 a.m., not in the apartment.

Petitioner's brother Anthony indicated that Petitioner went to sleep on the living room couch about 9:00 p.m., that Anthony went to sleep on the floor in the same room about 10:30 p.m., and that Petitioner was still asleep when Anthony awoke about 1:30 or 2:00 a.m. for a short time before going back to sleep on the floor next to Petitioner. (CT 130-31.)  Anthony said he did not see Stillwell at the apartment (id.), which is inconsistent with his mother's testimony that Petitioner and Stillwell were talking so loudly in the living room at 4:00 a.m. that they woke her in her bedroom but did not wake Anthony.

Petitioner's brother Deron stated that Stillwell came over about 9:00 p.m. to borrow Petitioner's jacket, which was inconsistent with Anthony's statement that he did not see

Stillwell. (CT 132-33.) Deron said that when he went to sleep about 11:00 p.m., Petitioner and Anthony were playing video games, and when Deron awoke about 2:00 a.m., Petitioner and Anthony were asleep in the living room. (Id.)

The statements of the three family members were clearly inconsistent with respect to whether and when Stillwell was at the house, and the mother's statement, besides not providing an alibi, was potentially damaging to the defense by placing Stillwell and Petitioner together at 4:00 a.m., when (and near where) the victim said Petitioner met Stillwell. Deron's testimony would not aid in explaining why Petitioner's DNA was found on the beanie used to cover the victim's eyes, because the victim testified that someone other than Stillwell asked the driver/abductor for the beanie, which the driver took from his pocket about two hours before Stillwell joined the driver in the victim's car. Assuming these witnesses would have been credible and testified at trial consistently with their statements, they were susceptible to impeachment not only with the inconsistencies in their statements and conflicts with the trial evidence, but, even more significantly, by their family relationship to Petitioner. See 3A Wigmore, Evidence § 949 at 784 (Chadbourn rev. 1970) ("Among the commoner sorts of circumstances [from which bias may be inferred] are all those involving some intimate family relationship to one of the parties by blood or marriage . . . .) Furthermore, the statements provide a range of times when Petitioner was seen at the house, "about" 1:30 to 2:00 a.m. and not again until 4:00 a.m. As the victim was abducted about 1:20 a.m., and testified he was with Petitioner until about 4:00 a.m., the inexactitude of the statements in relation to time would have allowed the prosecutor to argue Petitioner may have left the house before 1:20 a.m. and returned about 4:00 a.m. Even assuming the brothers would have made credible witnesses, their testimony would not have "significantly altered the evidentiary posture of the case," as they could provide only weak and inconsistent alibi evidence, which had the potential to weaken the related defense strategy of challenging the eyewitness identification. Contrast Brown v. Myers, 137 F.3d 1154, 1157-58 (9th Cir. 1998) (finding prejudice in failing to call alibi witnesses where, although they were family members with inconsistencies in their accounts which were vague as to time, their testimony, which was consistent with the defendant's account, would have "altered significantly

the evidentiary posture of the case," and their absence left petitioner "without any effective defense.")

In sum, Petitioner was not deprived of a defense by the failure to present the alibi witnesses, and his primary defense was certainly stronger for the absence of testimony from his mother and Stillwell, whereas the brothers' testimony had only a potential to marginally improve the primary defense by presenting a weak alibi.  The Court finds that Petitioner has not demonstrated "a probability sufficient to undermine confidence in the outcome" caused by counsel's failure to interview or call the potential witnesses, and has therefore failed to demonstrate prejudice arising from counsel's deficient investigation.[5]  Strickland, 466 U.S. at 694; see also id. at 687 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial.")

Based on a de novo review of the record, the Court finds that habeas relief is not available as to Claim 2 because Petitioner has not shown he received constitutionally ineffective assistance of counsel arising from counsel's failure to interview or call potential witnesses.

**3.      Claim 3**

Petitioner alleges in Claim 3 that his right to due process under the Sixth and Fourteenth Amendments was violated because there was insufficient evidence to support the jury's gang enhancement finding.  (Pet. at 8; Pet. Mem. at 29-35.)  He argues that the evidence established that he intended to rob the victim only for his own personal gain, and does not support the jury's finding that he acted with "the specific intent to promote, further, or assist in any criminal conduct by gang members."  (Id.)

/ / /

---

[5]  Although development of the record is not necessary to resolve this claim, the Court notes it is prevented from holding an evidentiary hearing with respect to the family members.  Unlike Stillwell, from whom counsel appointed for purposes of the new trial motion obtained a post-trial statement, there is no indication the family members were contacted by post-trial counsel.  See Baja v. Ducharme, 187 F.3d 1075, 1079 (9th Cir. 1999) (holding that petitioner had failed to develop a factual basis for his claim in state proceedings because he had the opportunity to come forward with affidavits and other evidence in support of his ineffective assistance claim but failed to do so); see also Williams v. Taylor, 529 U.S. 420, 435 (2000) (finding that diligence in developing the record in state court "depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court.")

Respondent contends Claim 3 is procedurally defaulted, and, to the extent this Court can reach the merits, the claim is without merit because there is substantial evidence supporting the gang enhancement in the form of: (1) undisputed evidence that Petitioner and Stillwell were members of the same gang; (2) evidence that Petitioner committed the offense with Stillwell, who Petitioner instructed to shoot the victim if necessary; (3) evidence Petitioner communicated with the other people involved in the kidnapping through gang language; and (4) expert testimony that the crimes benefitted the gang.  (Ans. Mem. at 30-43.)

The Magistrate Judge found that the Court need not reach the issue of procedural default because Claim 3 fails on its merits.  (R&R at 20-21.)  Although Petitioner presented this claim to the state appellate court on direct appeal, which denied it on the merits, it was not included in the petition for review filed in the state supreme court.  (Lodgment Nos. 6-7.)  Rather, he presented it to the state supreme court in a habeas petition along with Claim 4 (alleging ineffective assistance in failing to stipulate to Petitioner's gang membership and seek to bifurcate the gang enhancement allegation), and Claim 6 (alleging the cumulative effect of the trial errors violated due process), which were also presented to and addressed on the merits by the state appellate court on direct appeal but omitted from the petition for review.  (Id.)  The state habeas petition was summarily denied with citations to In re Waltreus, 62 Cal.2d 218, 225 (1965) and In re Lindley, 29 Cal.2d 709, 723 (1947).  (ECF No. 16 at 15.)

A Waltreus citation does not affect the determination regarding procedural default.  Ylst v. Nunnemaker, 501 U.S. 797, 804 n.3 (1991) (observing with respect to California's Waltreus rule: "Since a later state decision based upon ineligibility for further state review neither rests upon procedural default nor lifts a pre-existing procedural default, its effect upon the availability of federal habeas is nil . . . .")  Respondent argues that because Lindley refers to a state rule against presenting insufficiency of the evidence claims on habeas rather than on direct appeal, it must have been applied to Claim 3, which challenges the sufficiency of the evidence supporting the gang enhancement.  However, the order denying the state habeas petition is ambiguous as to which procedural rule was applied to which claim, or whether Waltreus was applied to Claim 2, and the claim is not procedurally defaulted.  Ylst, 501 U.S. at 804 n.3;

<u>Washington v. Cambra</u>, 208 F.3d 832, 834 (9th Cir. 2000) (holding that when two state procedural bars are invoked in a single order disposing of multiple claims, the ambiguity precludes procedural default unless both bars are adequate and independent.)

The Court declines to adopt the Magistrate Judge's finding in regard to procedural default, and finds that Claims 3, 4 and 6 are not procedurally defaulted in this Court. The Court will apply the provisions of 28 U.S.C. § 2254(d) to the last reasoned decision of the state court (the appellate court opinion) with respect to these claims. <u>Ylst</u>, 501 U.S. at 803-04 & n.3.

The Magistrate Judge found that the appellate court's opinion was neither contrary to, nor an unreasonable application of, clearly established federal law, because there was sufficient evidence adduced at trial to support the jury finding that Petitioner committed the kidnapping for the benefit of his gang and had the requisite specific intent to kidnap the victim in furtherance of his gang activities. (R&R at 20-23.) The Magistrate Judge referred to evidence that: (1) Petitioner proclaimed he was a gangster; (2) he spoke to the men assisting him in a lingo the gang expert identified as characteristic of the West Coast Crips, a gang which the expert testified was in the habit of committing robberies of pedestrians such as the victim here; (3) Petitioner admitted he was a member of that gang, an admission supported by his gang tattoo; and (4) Stillwell, who Petitioner referred to as a "soldier," had assisted Petitioner in the crime and was a documented member of the West Coast Crips. (R&R at 23.) Petitioner objects to that finding, arguing that the only evidence presented in support of the gang enhancement was the victim's testimony that Petitioner said: "I'm a gangster," and merely being a gangster does not show that the crime was committed for the purpose of promoting a gang. (Obj. at 8.)

The Court agrees with the Magistrate Judge and the state court that there is sufficient evidence in the record to support the jury's finding that Petitioner committed the crimes, "for the benefit of, at the direction of, or in association with a criminal street gang" and "with the specific intent to promote, further or assist in criminal conduct by gang members within the meaning of Penal Code Section 186.22(b)(1)." (CT 217-18 (verdicts).) The Ninth Circuit has emphasized the importance of keeping those two requirements separate, and has indicated that the specific intent requirement "is not satisfied by evidence of mere membership in a criminal street gang."

1   Briceno v. Scribner, 555 F.3d 1069, 1077-78 (9th Cir. 2009), citing Garcia v. Carey, 395 F.3d

2   1099, 1102-03 & n.5 (9th Cir. 2005).  For the reasons set forth in the R&R, and as discussed

3   more throughly in Claim 4 below, the Court finds sufficient evidence in the record to support

4   both requirements.  Petitioner's statements to the victim that he was a gangster who did this for

5   a living and took the car radio because "we" need to get something out of the kidnapping,

6   coupled with evidence that at least two of the perpetrators, Petitioner and Stillwell, were

7   documented gang members cooperating with each other and communicating in gang slang,

8   demonstrates that Petitioner was working for the benefit of, at the direction of, or in association

9   with, his gang.  See Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005) (holding that a federal

10  habeas court applying 28 U.S.C. § 2254(d) owes an additional layer of deference to the state

11  court opinion when applying the standard of Jackson v. Virginia, 443 U.S. 307, 324 (1979)

12  ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to

13  the prosecution, any rational trier of fact could have found the essential elements of the crime

14  beyond a reasonable doubt.")).

15        The second requirement, that Petitioner had the specific intent to "promote, further, or

16  assist in any criminal conduct by gang members," was met through the previous evidence

17  coupled with the gang expert's testimony (RT 1332-44), that the manner in which the crimes

18  here were committed, by gang members cooperating with each other, benefits the gang: (1) by

19  bolstering its image and that of its members; and (2) because the proceeds of such crimes are

20  shared among the members of the gang, permitting the gang to purchase more drugs to sell and

21  more weapons which they can use to commit more crimes.  See Briceno, 555 F.3d at 1081, citing

22  People v. Villalobos, 145 Cal.App.4th 310, 322 (2006) ("Commission of a crime in concert with

23  known gang members is substantial evidence which supports the inference that the defendant

24  acted with the specific intent to promote, further or assist gang members in the commission of

25  the crime.")

26        The Court adopts the findings and conclusions of the Magistrate Judge.  Habeas relief is

27  denied as to Claim 3 on the basis that the state court's adjudication of the claim does not involve

28  an objectively unreasonable application of clearly established federal law.

1    **4.    Claim 4**

2        Petitioner alleges in Claim 4 that his trial counsel rendered constitutionally ineffective

3    assistance in failing to seek to stipulate to the truth of Petitioner's gang membership, and for

4    failing to seek to bifurcate the gang enhancement allegation.  (Pet. at 9; Pet. Mem. at 35-38.)

5    Petitioner argues that the predicate offenses used to prove the gang allegation had no relevance

6    to the kidnapping and were inflammatory, that his gang membership was obvious and

7    uncontested, and that the gang evidence swayed the jury to convict him regardless of his actual

8    guilt by suggesting that even if he did not commit this crime it would be a good thing to have

9    him behind bars.  (Id.)

10        Respondent argues that the state court was correct to note that nothing in the record

11    suggests the prosecutor would have accepted a stipulation.  (Ans. Mem. at 28-30.)  Respondent

12    argues Petitioner was not prejudiced by the failure to seek bifurcation in light of the victim's

13    testimony that Petitioner told him he was a gangster, enlisted the assistance of other gang

14    members, and called Stillwell his "soldier" when he gave him a gun and instructed him to shoot

15    the victim if necessary, all of which would have been admitted even with bifurcation.  (Id.)

16        The state appellate court found there was no indication in the record the prosecutor would

17    have been willing to accept a stipulation that Petitioner was a gang member, and that, under state

18    law, the prosecutor cannot be compelled to accept a stipulation "if the effect would be to deprive

19    the state's case of its persuasiveness and forcefulness." (Lodgment No. 6, Taylor, No. D055375,

20    slip op. at 34.)  The court then stated:

21        In view of Kukukafi's description of Taylor as the man who held him at
22    gunpoint for several hours; threatened to kill him if he did not obtain money;
     enlisted the assistance of other gang members during the carjacking, kidnapping
23    and robbery; told the victim he was a gangster; and gave a gun to his "soldier" and
     instructed him to shoot Kukukafi if necessary, Taylor does not show there is a
24    reasonable probability the result of his conviction on the instant offenses would
     have been different had defense counsel sought to bifurcate the gang enhancement
25    allegation or stipulated to gang membership.

26    (Id.)

27        The Magistrate Judge found that because overwhelming evidence of Petitioner's guilt

28    exists in the record, the appellate court's determination that Petitioner had not shown prejudice

-32-

arising from a failure to bifurcate the gang evidence, was neither contrary to, nor involved an unreasonable application of, <u>Strickland</u>. (R&R at 17-18.) Petitioner objects, arguing that the state court finding that bifurcating the gang evidence would have deprived the prosecution of the persuasiveness and forcefulness of its case, is at odds with the R&R's finding that overwhelming evidence established Petitioner's guilt. (Obj. at 5-6.) Petitioner indicates that such a "straddling of the fence" demonstrates a lack of confidence in the case against him. (<u>Id.</u> at 6.)

Bifurcation of gang evidence in a California criminal trial may be appropriate where "[t]he predicate offenses offered to establish a 'pattern of criminal gang activity'" are not related to the crimes charged or to the defendant, or, even if they are, where their admission is "extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." <u>People v. Hernandez</u>, 33 Cal.4th 1040, 1049 (2004), quoting Cal. Penal Code section 186.22(e). As will be seen, the evidence presented in support of the gang enhancement which was not strictly relevant to the charged offenses was not extraordinarily prejudicial. It is also clear that Petitioner is incorrect in his assertion that the evidence showed he was only interested in robbing the victim for his own personal gain.

The jury was instructed that in order to prove kidnapping for robbery, the prosecution must prove: (1) the defendant intended to commit a robbery, which is the taking of property from the immediate possession of another with the intent to permanently deprive the person of the property through the use of force or fear sufficient to prevent the person from resisting the taking; (2) while acting with that intent, the defendant took, held, or detained another person by using force or fear; (3) using that force or fear he moved the person a substantial distance beyond that merely incidental to the robbery; and (4) the movement began at a time when the defendant already intended to commit robbery. (RT 1623-26; CT 77.) The victim testified Petitioner approached him as he was walking home, pointed a gun at his forehead, and demanded money; when the victim was unable to produce anything other than an ATM card, Petitioner spoke to one of the people he was with in a strange language and the two of them marched the victim at gunpoint about one city block to his car; Petitioner then drove him to several ATM machines

where he was forced to attempt to withdraw money. (RT 896-926.) The victim asked Petitioner how he could do something like this to someone of his own race, and Petitioner responded: "I don't give a fuck. Black, white, Mexican. I'm a gangster. I do that for a living." (RT 921.) When the victim told Petitioner he had an infant daughter who would have only her mother to look after her if he died, Petitioner told him: "I don't give a fuck. This is my job. This is what I'm doing for a living," and told him, "I will shoot you in your balls so you can't have no more kids." (RT 927, 944.) When Petitioner took the victim's car radio after the victim was unable to get cash from the ATMs, Petitioner told him: "Sorry, I have to do that since we didn't get anything from you. Now we need this money. We need anything right now, so, sorry, we're going to take your radio." (RT 924) (emphasis added). When he left the victim with Stillwell, Petitioner told called Stillwell his "soldier" and instructed him to "just go ahead and blow his head off" if the victim did something wrong. (RT 937.)  All that evidence was relevant to the kidnapping for robbery count, in particular the elements that Petitioner used force or fear sufficient to prevent the victim from resisting either the taking of his property or the movement of his person, and would have been admissible even if Petitioner had stipulated to being a gang member, and even in a bifurcated proceeding.

The evidence admitted to prove the gang enhancement which was not strictly relevant to the kidnapping for robbery count included the gang expert's testimony that the language Petitioner used to communicate with the people who were assisting him was a type of gang slang used by the West Coast Crips (RT 1362), and that it furthers the gang's interests when gang members commit crimes together. (RT 1342-44.)  Evidence was also introduced that Petitioner told a police officer, in a vulgar, disrespectful and braggadocios manner, that he was a member of the West Coast Crips, and that Petitioner and Stillwell were both documented members of that gang. (RT 1132-33, 1306-22.)  Finally, the gang expert provided three examples of statutorily required predicate acts for a gang, in this case the West Coast Crips, to be classified as a criminal street gang under California Penal Code section 186.22, including: (1) a drive-by shooting where an innocent person was killed; (2) an incident where a gang member shot a man for complaining that he did not get what he had paid for in a small marijuana purchase, and then stood over the

man lying helplessly on the ground and fired five more shots into him; and (3) an incident where gang members opened fire on a rival gang member who was standing at his open door listening to the sales pitch of an innocent shoe salesman who was caught in the line of fire. (RT 1331-40.) Petitioner was not involved in any of those crimes. (Id.; RT 1376.)

    With respect to the evidence that fellow gang members assisted Petitioner in the offense and in doing so benefitted their gang, and Petitioner's proud and vulgar pronouncements of gang membership, the victim's testimony, which would have come in even in a bifurcated proceeding, that Petitioner was doing what he was doing because he was a gangster who did it for a living, and that he showed no compassion whatsoever to the victim or the victim's infant daughter, was powerful on its own.  It was placed in context by the gang evidence, but not unfairly so. Evidence that Petitioner told the victim his car radio was required to be taken because "we" need to get something, and the orders and directions he gave to the other people who helped him, amounted to an admission by Petitioner that he was not working on his own or for his own benefit, and was admissible on the kidnapping for robbery count.  Likewise, with respect to the evidence regarding the activities of the West Coast Crips gang, even if Petitioner had stipulated to being a member of a criminal street gang, and even if the gang enhancement had been bifurcated, it is unlikely the jury would have viewed him differently had they been spared hearing what ordinary jurors already know, that members of criminal street gangs engage in murderous acts.  The gang evidence could even be viewed as relatively mild in comparison to Petitioner's own admissions, admissible even with bifurcation, that he was the type of gangster who was not only utterly lacking in compassion for the victim's infant daughter, but was willing to shoot the victim in the testicles to prevent him from having more children if he did not produce money.  Thus, Petitioner has not only failed to show that an offered stipulation would have been accepted, or that a bifurcation motion would have been granted, he has made no showing that the result of the proceedings would have been different had his counsel sought a stipulation or bifurcation, even if counsel's efforts had been successful.

    Based on a de novo review, the Court denies habeas relief on the basis that the state appellate court's finding that counsel was not deficient in failing to seek a stipulation or

11cv1165

bifurcation, and that Petitioner was not prejudiced by those failures, was not an unreasonable application of <u>Strickland</u>.

**5.    Claim 5**

Petitioner alleges in Claim 5 that his trial counsel rendered constitutionally ineffective assistance when he failed to object to testimony that Petitioner was on probation.  (Pet. at 9; Pet. Mem. at 38-39.)   Respondent answers that the state court reasonably found that counsel's decision not to object to the brief testimony was a reasonable tactical decision, and that in light of the overwhelming evidence of guilt, he cannot show prejudice. (Ans. Mem. at 30.)

James Juns, an El Cajon Police Officer, testified that he had contacts with Petitioner at least ten times while he was a patrol officer. (RT 1125.) During one contact, Petitioner shouted at Juns: "West Coast, nigger, you can't touch me now, I'm on probation, Juns." (RT 1132.) When asked about another contact, Juns stated:  "I saw Mr. Taylor near Edward Brooks, who was a self-admitted gang member.  At that time, um, Mr. Taylor was on probation with gang conditions.  Um, he was, according to my - my [field interview report], within 10 to 15 feet of Mr. Brooks.  I remember contacting Mr. Taylor's probation officer, advising her of the contact and, ah, she advised that Mr. Taylor was not to be violated." (RT 1133.)

The appellate court found that defense counsel's decision not to object was a reasonable tactical decision because, instead of drawing the jury's attention to the testimony by objecting, counsel brought out on cross-examination of another officer that Petitioner had never been arrested for anything other than making a threat when he was a juvenile. (Lodgment No. 6, <u>Taylor</u>, No. D055375, slip op. at 35-36.) The officer referred to testified, regarding that incident, that Petitioner was at school when he challenged another student to a fight, and that Petitioner referred to himself as a member of the West Coast Crips in that incident. (RT 1321.) On cross-examination by defense counsel, the officer testified that Petitioner had never been arrested other than for that juvenile threat, and the officer admitted that he did not know whether the "victim" in that incident was also a gang member. (RT 1376.)

/ / /

/ / /

11cv1165

The state court also found no <u>Strickland</u> prejudice by the admission of evidence that Petitioner had been on probation with gang conditions which arose from an incident when he was in high school.  (Lodgment No. 6, <u>Taylor</u>, No. D055375, slip op. at 36.)  The court found that "the jury could reasonably determine [the victim] was a credible witness and his testimony was corroborated by the evidence of Taylor's DNA on the gun and beanie and other circumstantial evidence." (<u>Id.</u>)

The Magistrate Judge found that the appellate court's determination was neither contrary to, nor involved an unreasonable application of, <u>Strickland</u>, in light of trial counsel's pre-trial efforts to exclude evidence of the incident, the brevity of the testimony, counsel's effective cross-examination, and the overwhelming evidence of guilt. (R&R at 18-19.) Petitioner objects, indicating that: (1) because any reference to his probation had been excluded by a pre-trial order, counsel should have been expected to object; (2) the evidence was improperly admitted to show he had a criminal gang disposition; and (3) it was prejudicial because gang members are viewed in the same context as terrorists by the general public.[6] (Obj. at 7.)

Based on a de novo review, the Court adopts the findings and conclusions of the Magistrate Judge with respect to this claim over Petitioner's objections.  Habeas relief is denied because the state appellate court's opinion did not involve an unreasonable application of <u>Strickland</u> for the reasons set forth in the R&R.

**6.    Claim 6**

Petitioner alleges in his final claim that the accumulation of errors supports a finding that he was denied his Fourteenth Amendment right to due process.  (Pet. at 9; Pet. Mem. at 40-41.) He points specifically to the following errors: (1) failure by the authorities to conduct a live line-up with the victim in order to avoid the victim seeing Petitioner for the first time at the preliminary hearing wearing jail clothing and seated next to Stillwell, who the victim had already

---

[6]  The prosecutor sought in a pre-trial motion to introduce the juvenile adjudication which occurred about three years earlier, and which involved Petitioner making verbal threats "of a gang character." (RT 520-25.) The trial judge denied the motion based on remoteness and lack of probative value, and instructed the prosecutor to instruct her gang expert not to go into specific details of the offense, and to refer to it in a general and generic manner if necessary. (<u>Id.</u>)

identified; (2) the loss of an alibi defense arising from his trial counsel's unwarranted and unsupported assumption that the alibi witnesses would not hold up under cross-examination; and (3) counsel's lack of effort to sanitize the gang evidence through stipulation and bifurcation, or to prevent the jury from learning about Petitioner's criminal history by objecting to Officer Juns' testimony.  (Id.)  Respondent contends that because this claim was denied by the state supreme court with a citation to Waltreus, it is procedurally defaulted.  (Ans. Mem. at 43.)  Respondent also contends the claim is without merit because Petitioner received a fair trial.  (Id. at 44.)

The state appellate court denied this claim, stating:

> Taylor contends the cumulative prejudicial effect of the various errors he has raised on appeal deprived him of a fair trial.  We have rejected Taylor's claims of error.  (See Cal. Const., art. 6, § 13; *People v. Crayton* (2002) 28 Cal.4th 346, 364; *People v. Jenkins* (2000) 22 Cal.4th 900, 1056.)  Taylor received a fair trial.  (*People v. Mincey* (1992) 2 Cal.4th 408, 454.)

(Lodgment No. 6, Taylor, No. D055375, slip op. at 36-37.)

The Magistrate Judge recommends denying Claim 6 on the basis that: "Petitioner has not established that any substantial constitutional error occurred in his case under any of his five cognizable claims."  (R&R at 24.)  Petitioner objects to that finding, contending that his trial was wrought with error.  (Obj. at 8-9.)

The Court declines to adopt the findings and conclusions of the Magistrate Judge, which did not subject the appellate court's adjudication of this claim to 28 U.S.C. § 2254(d) scrutiny.  The Court will consider the claim in the first instance.  For the reasons set forth above with respect to Claim 4, this claim is not procedurally defaulted, and the Court will apply the provisions of 28 U.S.C. § 2254(d) to the appellate court opinion.

"The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting trial fundamentally unfair." Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi, 410 U.S. 284, 298 (1973).  Where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant."  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the

overall effect of all the errors in the context of the evidence introduced at trial against the defendant." Id., quoting United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988). "Where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors." Frederick, 78 F.3d at 1381.

As set forth above, this is not a case where the prosecution's case was weak.  Rather, there was direct testimony from Petitioner's victim, who positively identified Petitioner.  The identification, although made under suggestive circumstances, was nevertheless strong, reliable and supported by circumstantial evidence that Petitioner committed the crimes.  The jury was presented with evidence that Petitioner was the major contributor of the DNA found on the gun and beanie, and that Stillwell's DNA was not found on the gun or beanie.  (RT 1073-78.)  The jury heard the victim's physical description of the perpetrator given to the police shortly after the crimes and were able to view Petitioner in the courtroom.  The jury also heard the victim's description of what Petitioner was wearing during the crimes, and viewed the ATM photographs which showed the perpetrator wearing a jacket which matched the jacket described by the victim and matched the jacket Petitioner was wearing when arrested. (RT 1348-50.)  Finally, Petitioner parked the victim's car near his own apartment, said he was going to sleep, and was arrested shortly thereafter in his apartment.  In light of the strong evidence of guilt, in particular the circumstantial evidence supporting the victim's identification, it is unlikely Petitioner could have been prejudiced by the accumulation of errors which individually did not prejudice him. Frederick, 78 F.3d at 1381.

Petitioner is not entitled to federal habeas relief irrespective of whether the adjudication of this claim by the appellate court was contrary to, or involved an unreasonable application of, clearly established federal law which requires a review of the overall effect of all trial errors in order to determine if a state criminal defendant received a fair trial, and irrespective of whether the state court's finding that no errors occurred is based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Even assuming the state court's adjudication of this claim was objectively unreasonable within the meaning of 28 U.S.C. § 2254(d), federal habeas relief is unavailable because Petitioner has not demonstrated a federal

1   due process violation arising from the cumulative effect of trial errors.[7] Frederick, 78 F.3d at

2   1381; Fry, 551 U.S. at 119-22 (holding that a federal habeas petitioner must show a

3   constitutional violation even if § 2254(d) has been satisfied).

4   **7.      Conclusion and Order**

5       The Court **ADOPTS IN PART**, **ADOPTS AS MODIFIED IN PART**, and **DECLINES**

6   **TO ADOPT IN PART** the findings and conclusions of the Magistrate Judge as set forth above.

7   The Petition for a Writ of Habeas Corpus is **DENIED**, and the Court **ISSUES** a Certificate of

8   Appealability as to all claims presented in the Petition.

9       The Clerk of Court shall enter judgment denying the Petition and issuing a Certificate of

10  Appealability.

11      **IT IS SO ORDERED.**

12  DATED: May 21, 2014

13  

14  **BARRY TED MOSKOWITZ**
    United States District Judge

---

26      [7]  The Court has also considered the cumulative impact of counsel's decisions and finds no

27  prejudice. See Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) ("It will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine

28  whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance."), quoting Strickland, 466 U.S. at 689.